IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CLAUDIA MACIAS, FERNANDO
DIAZ and ALANI DIAZ, by next
friend Claudia Macias,

                    Plaintiff,                                          OPINION AND ORDER

        v.
                                                                         18-cv-358-wmc

MT. OLYMPUS RESORTS, LLC,

                    Defendant.

Plaintiffs spouses Claudia Macias and Fernando Diaz and their minor child Alani Diaz assert negligence and private nuisance claims against defendant Mt. Olympus Resorts, LLC, based on alleged bed bug bites they sustained during a stay at the resort in September 2016.[1]  Before the court is defendant's motion for summary judgment in its favor as to all claims, principally on the basis that expert testimony is required to prove plaintiffs' claims.[2]  For the reasons that follow, the court grant in part and deny in part defendant's motion.  Specifically, the court grants defendant's motion on plaintiffs' claim of negligence with

---

[1] The court has subject matter jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332(a).  Plaintiff Claudia Macias and Alani Diaz are citizens of Illinois.  (Am. Compl. (dkt. #28) ¶¶ 15, 17.)  As a citizen of Mexico and a lawful permanent resident of the United States, domiciled in Illinois, plaintiff Fernando Diaz is a citizen of both Mexico and Illinois.  (*Id.* ¶ 16.)  *See Intec USA, LLC v. Engle*, 467 F.3d 1038, 1043 (7th Cir. 2006) (holding that "lawful permanent-resident aliens have both state and foreign citizenship").  Defendant Mt. Olympus Resorts, LLC, is a citizen of Wisconsin, given that its sole member, Nick Laskaris, is a citizen of Wisconsin.  (Am. Compl. (dkt. #28) ¶ 18.)  Finally, for the reasons already explained by the court, the amount in controversy exceeds $75,000.  (3/18/19 Order (dkt. #27).)

[2] Also before the court is plaintiffs' motion for leave to file an amended complaint.  (Dkt. #29.)  The proposed amended pleading simply adds additional factual allegations, but does not assert any new claims.  As such, the amendment is unnecessary.  The original complaint provided adequate notice to defendant, and plaintiffs ushered their evidence (consistent with the new allegations in the proposed amended complaint) in opposition to defendants' motion.  Accordingly, the court will deny the motion for leave to file an amended complaint.

respect to prevention or remediation of bed bug infestations, but will deny defendant's motion in part, allowing plaintiffs to proceed on their claim that defendant failed to conduct adequate inspections for bed bugs in their room. The court will also grant summary judgment in defendant's favor on plaintiffs' claim for punitive damages, because plaintiffs have failed to put forth sufficient evidence to allow a reasonable jury to find defendant acted maliciously or in an intentional disregard to plaintiffs' rights.

UNDISPUTED FACTS[3]

## A. Bed Bugs Generally

Bed bugs were nearly eliminated as a problem during the years when DDT was in use. With the banning of DDT, bed bugs have returned with a vengeance. Indeed, bed bugs can now be found virtually anywhere many people come and go, including hospitals, office buildings, hotels and motels. Defendant's expert Michael F. Potter, Ph.D., an entomologist with bed bug expertise, states that "[u]nlike cockroaches or flies that feed on filth, bed bugs can persist in pristine environments." (Potter Aff. (dkt. #37) ¶ 7.) This statement is consistent with the medical information that plaintiffs received from Alani Diaz's medical visit, which stated, "Usually they [bed bugs] are found in places where many people come and go. Hotels, shelters, hospitals. It does not matter whether the place is dirty or clean." (Ward Aff., Ex. A (dkt. #35-1) 13.)

Defendant's expert Potter further opines that Mt. Olympus is "an especially challenging environment in which to prevent bed bugs," given the thousands of visitors

---

[3] Unless otherwise noted, the court finds the following facts material and undisputed.

each year in close proximity to metropolitan Chicago.  (Potter Aff. (dkt. #37) ¶ 3.)[4]  "The

perpetual flow of guests makes it all but impossible to avoid introduction of the bugs with

suitcases, backpacks, clothing, shoes, toys, wheelchairs and other belongings."  (*Id.*)  Potter

further opines that "[m]aximum occupancy and rapid turnover between guests make it

challenging to inspect painstakingly for bed bugs."  (*Id.* ¶ 4.)  Furthermore, Potter explains

that inspections also are not entirely reliable because of certain characteristics of bed bugs:

> Bed bugs are small, secretive and nocturnal.  Once the pests are
> introduced, they often remain unnoticed.  The eggs and newly
> emerged nymphs are no bigger than dust specks.  During the
> day, they hide in cracks and crevices away from cleaning and
> housekeeping activities.

(*Id.* at ¶ 5.)

## B. Mt. Olympus's Efforts to Treat Bed Bugs

Over the years, Mt. Olympus has taken several steps to prevent, inspect for and

remediate bed bugs.  For example, Mt. Olympus consults outside vendors and trade

journals regarding best practices for bed bug extermination.  At one point, Mt. Olympus

hired outside vendors to perform pest extermination through "thermal treatment."[5]  In

addition to these heat remediation efforts, Mt. Olympus used an outside pest control

service to administer a chemical remediation process in 2011.  Subsequently, Mt. Olympus

---

[4] Consistent with this, plaintiffs represent that there are online complaints about bed bugs at Mt.
Olympus, and direct the court to their amended complaint, containing four such complaints, dating
back to 2013.  As defendant points out, however, this is hearsay, at least for the truth of the matter
asserted, as opposed to Mt. Olympus having knowledge of the risks, which is not disputable.
Regardless, there appears to be no dispute that Mt. Olympus has had bed bugs, including a
confirmed case in plaintiffs' room following their stay.

[5] This approach is described in more detail below.

began administering treatments of Dry Earth and Cedar Oil as preventative measures, and also tried a pesticide Temprid. Mt. Olympus has also hired a professional pest control company to perform preventative treatment to room outlets, presumably to prevent pest migration. In the past, Mt. Olympus has even used bed-bug sniffing dogs.

Beginning in 2014, Mt. Olympus stopped outsourcing bed bug remediation in favor of purchasing its own heat machine, so that it could conduct remediation in house. Mt. Olympus further purchased sealed mattress protectors designed to block bed bugs, although plaintiffs point out that during 2015 and 2016 some mattresses used by guests were not encased in plastic, and there is no documentation showing that the mattresses used in 2016 in Building 4 were encased in the preventative bed bug plastic. In addition, Mt. Olympus began phasing out old mattresses in 2013 in favor of a new design, with chemically-treated fabric that repels bed bugs. Plaintiffs do not dispute this transition, but point out that "the process is now 6 years [a]long and still not complete." (Pls.' Resp. to Def.'s PFOFs (dkt. #62) ¶ 24.) Plaintiffs also point out that the mattresses use a plant-based essential oil Santeol, which defendant's expert does not include on the list of products he recommends to prevent bed bugs. Mt. Olympus's expert Potter also acknowledges that the "utility of plant oils in preventing problems with bed bugs needs further study." (Bulin Dep. (dkt. #51) 70.) Nonetheless, Mt. Olympus's Housekeeping Manager, Douglas Bulin, conducted his own test to gauge the effectiveness of the new mattresses, finding that live bed bugs placed on the mattress were dead within 20-30 minutes. (Def.'s Resp. to Pls.' Add'l PFOFs (dkt. #64) ¶ 112.)

More recently, as alluded to above, Mt. Olympus's remediation efforts have focused

on thermal treatment, which its expert describes as the "gold standard" for eradicating bed bugs.  (Potter Aff. (dkt. #37) ¶ 6.)  Mt. Olympus has invested approximately $100,000 in heat-treatment equipment and an infrared heat camera for in-house use.  Mt. Olympus now has three thermal heat-treating devices on the premises.  In 2014, Mt. Olympus also sent Maintenance Department Assistant Phil Massari to Minnesota to attend training on how to operate these trailer-sized devices put on by the manufacturer of the equipment, although plaintiffs point out that it was only a three-hour training and Massari was the only employee to attend.  Massari in turn trained Maintenance Manager Shaun Bellock, and now Bellock alone primarily operates the thermal-treatment, since Massari testified at his deposition that he no longer performed remediation due to his age.  Moreover, if a remediation need arises at night, night-time maintenance staff perform the heat-treatment.

As for inspections, since before 2016, Mt. Olympus has instructed its housekeeping and maintenance staff, including seasonal employees, on how to monitor for bed bugs, although plaintiffs point out that there is "no documentation" of such training.  The maintenance department also has pictures posted on the front of a locker in the maintenance quarters to show what bed bugs look like and how to recognize signs of their presence.  In addition to inspecting and treating the guest rooms, Mt. Olympus inspects its laundry facility, employee housing, storage areas and transport vehicles for the presence of bed bugs.

When bed bugs are detected, Mt. Olympus currently has a variety of processes to

try to eradicate them.[6]   Specifically, Bulin testified that "we have chemical, we have mattress treatment, we have heat eradication, we have procedures of sanding to make sure that there are no eggs or any residual left." (Bulin Dep. (dkt. #51) 142.)  If bed bugs are located in a guest room, Bellock or Massari would move the guests, lock the room and heat-treat it.[7]  Mt. Olympus represents that having its own heat remediation equipment allows it to treat a room for an even longer period of time than suggested by industry standards and to do it immediately, without waiting for a third-party pest control company, thus reducing the risk of cross-contamination.  Still, defendant's expert acknowledges that even after treatment, there is no way to be 100 percent certain that the problem is eradicated.

### C. Plaintiffs' Stay at Mt. Olympus

Plaintiffs stayed in hotel room number 20655 in Building 4 at the Mt. Olympus resort for two days in 2016, arriving at 1:52 a.m. on September 17, 2016, and checking out sometime on September 19, 2016.  During their stay, plaintiffs suffered from bed bug bites.  Specifically, Alani Diaz suffered bites the first two nights, while all three plaintiffs suffered bites on the third night.

At checkout, Claudia Macias complained to the front desk about bug bites during

---

[6] Plaintiffs dispute defendant's earlier iteration of this proposed finding on the basis of Bulin's testimony taking issue with the phrase "range of practices."  (Pls.' Resp. to Def.'s PFOFs (dkt. #62) ¶ 40).)  Regardless of the correct characterization of defendant's efforts to control bed bugs, there is no dispute Bulin testified that Mt. Olympus has a variety of processes (or indeed practices) for dealing with bed bugs.

[7] Defendant further submitted an affidavit from Jhevaughn Davis, a prior member of the maintenance staff, detailing his duties, prior training for checking beds for bed bugs, and responsibilities for notifying his supervisors if bed bugs are located.  (Def.'s PFOFs (dkt. #32) ¶¶ 41-44.)  Plaintiff does not dispute Davis's account, but points out that he was not working at Mt. Olympus during plaintiffs' stay.

their stay but staff told her that they were mosquito or other related bug bites. Plaintiffs did not specifically complain about suspected *bed bug* bites during their stay, although they did mention a concern about housekeeping not changing their sheets, and that concern was addressed promptly. After they returned to Chicago, plaintiff Alani Diaz was diagnosed with bed bugs.[8]

### D. Room 20655

There appear to have been only two *documented* complaints of the potential presence of bed bugs in Room 20655 between the years 2014 through plaintiffs' stay in 2016, although plaintiffs question the adequacy of defendant's documentation and whether these are the only complaints.[9] *First*, Mt. Olympus received a complaint of bed bugs in Room 20655 on June 15, 2016. Director of Safety Jason Hammond avers in his declaration that the complaint "was investigated and found to be 'negative' for bed bugs." (Hammond Decl. (dkt. #36) ¶ 6.) Plaintiffs challenge Hammond's personal knowledge to make this representation, but it appears undisputed that he reviewed documentation and provided a

---

[8] Plaintiffs submit a number of facts about the extent of their injuries, including that between them, they had 100 bites, suffered emotional distress, and have permanent scarring. (Pls.' Add'l PFOFs (dkt. #62) ¶¶ 74-78.)

[9] More specifically, plaintiffs argue that "[t]he discovery record is replete with evidence . . . show[ing] Mt. Olympus] does not have the requisite documentation of complaints, treatments and inspections, and that they acknowledge as much." (Pls.' Add'l PFOFs (dkt. #62) ¶ 81.) The record citations, however, do not provide the broad support plaintiffs claim. To be fair, defendant admitted in its discovery responses that "the requisite records which should accompany Code 99 [bed bug] complaints is not present in all of the Code 99 complaints tendered," and that there are no housekeeping reports showing remediation work but that there are other reports showing the work completed. (Ex. F (dkt. #60-6) ¶¶ 59, 65.) Still, there appears to be no dispute that Mt. Olympus tracks bed bug complaints in its reservation records -- a substantial, relevant portion of which it produced to plaintiffs during discovery.

declaration based on this "personal investigation." (*Id.* at ¶ 1.) Moreover, the Maintenance Manager Bellock testified at his deposition that the documentation shows an inspection was completed and that the results of the inspection were "negative" for "Code 99," which is Mt. Olympus's shorthand for bed bugs. (Bellock Depo. (dkt. #52) 105-06.)[10]

Between June 23, 2016, and September 19, 2016 (the date of plaintiffs' checking out), Room 20655 was occupied on a nearly constant basis. Even so, Mt. Olympus received no further, documented complaints of bed bugs in Room 20655 during that three-month period. Again, plaintiffs do not dispute that there is no documentation of any complaints during this period, but contend, without support, that there still may have been complaints.[11]

*Second*, after their stay, plaintiff Claudia Macias attempted to inform Mt. Olympus of her daughter's diagnosis of bed bugs. She eventually received a return call, during which the hotel staff said they would investigate the issue. Mt. Olympus also credited Macias $150.00 and issued her fifteen park passes. Plaintiffs, however, represent that they did not learn that the "code 99" was confirmed until February 22, 2019, in response to discovery served in this case.

---

[10] As plaintiffs point out, since Mt. Olympus does not want its staff to mention "bed bugs" over the radio, it instead instructs employees to use "Code 99."

[11] The court notes that in response to plaintiffs' motion to compel guest lists for Room 20655, the Magistrate Judge directed defendant's attorney to mail a letter drafted by plaintiffs' counsel to six sets of guests who stayed in Room 20655 before plaintiffs' stay. (5/3/19 Order (dkt. #56); Letters (dkt. ##66-71).) Given plaintiffs' failure to supplement the record, the court will infer that none of the contacted individuals responded to plaintiffs' counsel with complaints of bed bug bites, much less complained to Mt. Olympus, although the court would expect defendant's counsel if they or their client received any follow up from any of those individuals as well. *See* Wis. S. Ct. R. 20.3.3 (requiring candor toward the tribunal).

Maintenance Manager Bellock recalls heat-treating Room 20655 following plaintiffs' stay. In his deposition, however, Housekeeping Manager Bulin acknowledged that there is no documentation that following the September 20, 2016, confirmation of bed bugs, Room 20655 was remediated and also acknowledged that such remediation report should be in the record. (Bulin Dep. (dkt. #51) 128-29.) At the time of plaintiffs' complaint, two rooms close to plaintiffs' room were inspected and no evidence of bed bugs were found. The following spring, bed bug scat was located in Room 20655, and the room was heat-treated again at that time.

OPINION

## I. Requirement of Expert Testimony

Plaintiffs' deadline for naming expert witnesses was December 21, 2018, which passed without plaintiffs doing so. Defendant moves for summary judgment on the basis that plaintiffs cannot meet their burden of proving negligence or a private nuisance without expert testimony.[12]

"Whether expert testimony is necessary to support a given claim is a question of law." *Trinity Lutheran Church v. Dorschner Excavating, Inc.*, 2006 WI App 22, ¶ 26, 289 Wis. 2d 252, 710 N.W.2d 680. The general rule in Wisconsin is that expert testimony is

---

[12] Defendant also seeks summary judgment on public policy grounds. *See Hornback v. Archdiocese of Milwaukee*, 2008 WI 98, ¶ 15, 313 Wis. 2d 294, 305, 752, N.W.2d 862, 867. Consistent with its general practice, the court declines to consider these arguments before a finding of liability. *See Boyer v. Weyerhaeuser Co.*, No. 14-CV-143-WMC, 2015 WL 3485262, at *4 (W.D. Wis. June 2, 2015) (citing *Alvarado v. Sersch*, 2003 WI 55, ¶ 18, 262 Wis. 2d 74, 662 N.W.2d 350 ("In most cases, the better practice is to submit the case to the jury before determining whether the public policy considerations preclude liability.")).

necessary for "matters involving special knowledge or skill or experience on subjects which are not within the realm of ordinary experience of mankind, and which require special learning, study or experience." *Payne v. Milwaukee Sanitarium Found.*, 81 Wis. 2d 264, 276, 260 N.W.2d 386 (1977); *see also Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 2d 147, 150, 172 N.W.2d 427 (1969).[13] Under Wisconsin law, such a requirement is "an extraordinary one," and it is only to be applied by a trial court when a jury is faced with "unusually complex or esoteric issues" that fall outside "the realm of lay comprehension." *White v. Leeder*, 149 Wis. 2d 948, 960, 440 N.W.2d 557 (1989). As a result, determinations as to whether expert testimony is necessary are to be made on a case-by-case basis. *Netzel v. State Sand & Gravel Co.*, 51 Wis. 2d 1, 6, 186 N.W.2d 258 (1971).

In the context of negligence claims generally, "[w]here the presence or absence of negligence is 'reasonably comprehensible to the jury,' even though inferences are involved, expert testimony is not necessary." *Trinity Lutheran Church*, 2006 WI App 22, at ¶ 26 (quoting *City of Cedarburg Light & Water Comm'n v. Allis-Chalmers Mfg. Co.*, 33 Wis. 2d 560, 566-67, 148 N.W.2d 13 (1967)). However, if a negligence claim rests on "facts or principles" that are "extremely difficult for a conscientious juror to comprehend," then the trial court may, upon motion, "decline to allow the claim to go to trial in the absence of expert testimony." *Cedarburg*, 33 Wis. 2d at 567. Consequently, whether expert testimony is necessary in a negligence claim hinges upon the jury's ability to comprehend the claim

---

[13] Unlike the question of the admissibility of expert testimony under the Federal Rules of Evidence, federal courts look to applicable state law to determine whether expert testimony is necessary. *See, e.g., Chi. Coll. of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1345-46 (7th Cir. 1983) (interpreting Illinois' general rule requiring expert testimony as to a physicians standard of care to a negligence claim against an architect).

in the absence of expert testimony.

To prevail on a claim for negligence under Wisconsin common law, a plaintiff must prove that (1) the defendant breached its duty of care and (2) plaintiff suffered injury as a result. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865. Plaintiffs' private nuisance claim similarly requires a finding of "negligent conduct." *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 2005 WI 8, ¶ 33, 277 Wis. 2d 635, 661, 691 N.W.2d 658, 671.[14]

Here, defendant challenges plaintiffs' ability to demonstrate, without the assistance of expert testimony, the standard of care owed by a hotel to its guests in an effort to control or eliminate bed bugs and whether defendant's actions (or inactions) breached that standard of care. As an initial matter, there are certainly cases where a hotel owner's efforts to address bed bugs are so inadequate -- for example, where the hotel has adopted *no* practices to control bed bugs -- that a reasonable jury could surely conclude that the owner breached its duty of care without having to discern the exact contours of that duty of care, but this is not such a case. Indeed, defendant has itself put forth undisputed evidence that bed bugs are a prolific and common problem in the hotel industry, and they can thrive in pristine conditions. As a result, the simple presence of bed bugs does not give rise to a reasonable inference that a hotel owner breached a duty of care. Moreover, the undisputed record reflects that defendant has adopted extensive practices to address bed bugs, precluding a finding that it completely ignored this problem, even if plaintiffs have raised

---

[14] Intentional conduct could also form a basis for a private nuisance claim, *see Milwaukee Metro Sewage Dist.* 2005 WI 8, at ¶ 33, but plaintiffs are not pursuing a claim based on any intentional actions by defendant to expose plaintiffs to bed bugs.

a dispute as to the diligence of defendant's record-keeping and diligence with respect to remediation efforts. To demonstrate that defendant's efforts breached a duty of care, therefore, will require plaintiffs to put forth evidence from which a reasonable jury could conclude that defendant's specific efforts fall short of the duty of care owed to its guests.

Keeping in mind that the requirement for expert testimony turns on the particular facts and circumstances of a case, the court takes up the fundamental factual issues that will decide plaintiffs' various theories of negligence. Specifically, plaintiffs claim defendant failed to take adequate steps to (1) prevent, (2) detect, or (3) remediate bed bugs in Room 20655. As such, the court must assess the requirement for expert testimony with respect to those theories specifically, rather than some requirement more generally of expert testimony for negligence claims concerning bed bugs.

In support of its position, defendant directs the court to *CNH American, LLC v. Champion Environmental Services*, 863 F. Supp. 2d 793 (E.D. Wis. 2012), in which the court granted summary judgment to the defendant "[b]ecause standards of ordinary care regarding the handling, storage, and disposal of . . . hazardous wastes . . . fall outside common knowledge or ordinary experience," thus requiring "expert evidence on the applicable standard industry custom or practice." *Id.* at 812. Defendant argues that the handling of bed bugs in hotels is analogous to the handling of hazardous waste at issue in *CNH American.* Defendant also points to *City of Cedarburg*, 33 Wis. 2d 560, 148 N.W.2d 13, in which the Wisconsin Supreme Court held that expert testimony was required to proceed with a negligence claim against an engineer based on his failure to test a new engine designed to generate electricity in light of the complexity of the machinery. *Id.* at 566-68.

While the exercise of ordinary care for bed bugs is far more understandable for an average person than it would be for hazardous waste or electric engines, the court agrees that efforts to prevent bed bug infestations in commercial properties with many visitors may fall outside of the scope of common knowledge or ordinary experience, including the treatment of outlets, the use of mattress covers or chemically-treated mattresses, and the use of pesticides or natural chemicals.  More specifically, on the record at summary judgment, a lay jury may lack a sufficient basis in common knowledge to determine the standard of care owed to hotel guests concerning the prevention of bed bugs or to assess defendant's efforts vis-à-vis that standard to determine whether defendant breached its duty.  Moreover, the jury may find it beyond their common sense or general knowledge to determine whether defendant breached a duty of care in addressing or remediating a known bed bug infestation, whether through chemical treatment, heat therapy or other efforts. *See Shadday v. Omni Hotel Mgmt. Corp.*, 477 F.3d 511, 515 (7th Cir. 2007) (holding that expert testimony was required to determine "right standard of care to which to hold a hotel" in complex matters of security).[15]

Even if expert testimony is required, plaintiffs argue that they can simply rely on opinions offered by defendant's expert, Dr. Potter (Pl.'s Opp'n (dkt. #61) 15), but there are several problems with this argument.  First, as a practical matter, defendant states in its reply that it may not call Dr. Potter at trial, and directs the court to a Wisconsin

---

[15] On their part, plaintiffs point to cases where courts have determined expert testimony is not required, but these cases involve facts and circumstances within the general knowledge of a lay jury, and none involve, or come close to discussing, efforts to prevent and remediate bed bugs.  (Pls.' Opp'n (dkt. #61) 11.)

Supreme Court case holding that the voluntary exchange of expert reports does not open the door to an adverse examination of an expert witness without a showing of necessity. (Def.'s Reply (dkt. #63) 15.) Putting aside this issue, plaintiffs fail to explain how such "purported" opinions -- which are *not* disclosed in Potter's report, but rather plaintiffs represent are in Potter's academic reports -- would further their negligence claims. Specifically, with respect to Potter's opinions about inspections, the undisputed evidence is that Mt. Olympus trains its housekeeping staff to conduct "in-house surveillance," and staff conducted inspections of not only Room 20655 but also the adjacent rooms after the September 2016 confirmation of bed bugs, both of which appear consistent with Potter's surveys of hotel practices. Moreover, Potter's three other purported opinions concern the use of insecticides, which appear to be only marginally relevant in light of Mt. Olympus's shift to heat remediation efforts, which Potter himself labels as the "gold standard" remediation practice. Regardless, any critique of remediation efforts generally would be irrelevant to the negligence claim since none were attempted in Room 20655 until *after* plaintiffs' use of that room. Finally, given Potter's ultimate conclusion that "Mt. Olympus Resort took reasonable precautions to prevent and control bed bugs," plaintiffs' attempt to rely on Potter's broader opinions would fall short of supporting their negligence claims, at least with respect to prevention and remediation theories.

This finding, however, still leaves room for a negligence claim based on defendants' failure to inspect plaintiffs' hotel room after a bed bug complaint in June 2016, approximately three months before plaintiffs' stay. While defendant contends that no bed bugs were found at that time, and therefore the room was not treated for bed bugs, it would

not be much of a stretch for a reasonable jury to find it more likely than not that the fact that guests complained of bed bugs in June 2016 could give rise to a reasonable inference that the bed bugs were present, though perhaps dormant for some period of time until plaintiffs' stay in September 2016. Indeed, as Dr. Potter himself acknowledged, the possibility that hotel staff were negligent in their inspection of the room requires no special expertise. On the contrary, plaintiffs' criticisms of the reasonableness of defendant's training of staff to inspect for bed bugs and the efforts to insure compliance are both matters of common sense. Indeed, unlike more complex and unfamiliar prevention and remediation efforts for commercial properties, the basic inspection of mattresses and surrounding areas for signs of active or dormant bed bugs falls within the scope of common knowledge and general understanding of a lay jury. *See Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 10 (1st Cir. 2011) (holding that expert testimony was not required to establish that a furniture store breached its duty by delivering bedbug infested furniture to a customer).

This fact, coupled with plaintiffs' representation that Alani Diaz suffered bed bug bites each night of their stay, and plaintiffs' further representation that the sheets on their beds were not changed at least for one of the nights of their stay, could give rise to a reasonable inference that the housekeeping staff failed in their ordinary duty of care, including adequately inspecting the beds for bed bugs. Regardless, having only moved on the grounds that plaintiffs' claims required expert testimony, the court is unable to reach

this issue today.[16] As such, the court will permit plaintiffs to go forward on their negligence and private nuisance claims limited to the defendant's alleged failure to inspect Room 20655 for bed bugs after reports of an infestation in June 2016 and/or in the weeks leading up to plaintiffs' stay in September 2016.

## II. Punitive Damages

Defendants also seek summary judgment on plaintiffs' demand for punitive damages, arguing that plaintiffs failed to put forth evidence to support such an award. Wisconsin Statute § 895.043 provides: "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." In their Amended Complaint, plaintiffs allege that defendant "maliciously with intentional disregard for the rights of Plaintiffs failed to warn Plaintiff of the presence of bedbugs at the Mt. Olympus." (Am. Compl. (dkt. #28) ¶ 23(c).) As defendant points out, however, plaintiff's evidence does not support that claim.

In response, plaintiffs proffer the following eleven pieces of "evidence" to support its claim:

> (1) that Defendant uses Code 99 to refer to bedbugs; (2) Defendant's employees are instructed not to mention bedbugs; (3) Defendant is well aware of the problem; (4) there have been numerous general prior complaints; (5) there were specific prior complaints about bedbugs in building 4 and even [about the] room in which Plaintiffs stayed; (6) Defendant attempted to deny the issue was bedbugs when confronted by Plaintiffs; (7) even after Plaintiffs sought medical treatment and were

---

[16] The scope and basis for this more limited claim can be further addressed by the parties in their motions *in limine* and during argument at the final pretrial conference.

told suspected bedbugs, Defendant denied it; (8) Defendant does not admit bedbugs even after a confirmed Code 99; (9) Defendant has moved its alleged extermination efforts in-house to save money, but has not shown an ability to control the problem; and (10) Defendant has shown this level of recklessness notwithstanding its knowledge of the problem, contribution to the problem with its lax procedures, inadequate remediation and use of migrant visa worker[s]; and (11) Defendant's expert testified Defendant, under the circumstances, should be "hyper-vigilant."

(Pls.' Opp'n (dkt. #61) 22-23.)

As an initial matter, a fundamental problem with this list is the lack of citations to the record, and, indeed, a number of the points on this list are actually belied by the record. For example, there is no evidence that Mt. Olympus denied the presence of bed bugs after being told by plaintiffs of Alani Diaz's diagnosis. Instead, the record reflects that Mt. Olympus inspected the room, took steps to remediate, refunded plaintiffs $150, and issued them 15 park passes. Similarly, plaintiffs raise an issue about the use of migrant visa workers, but have failed to develop *any* evidence to demonstrate that this contributed to any bed bug problem.

The remainder of plaintiffs' list is underwhelming as well. The thrust of plaintiffs' evidence is that defendant is reluctant to mention the word "bed bug" in front of guests and instead opts to use "Code 99" as shorthand for a suspected problem; defendant conducts remediation in-house, in part for cost savings reasons; and while defendant is aware of the extent of bed bug problem in the hotel industry, it is not vigilant enough in preventing, inspecting for, or remediating this problem. None of this evidence viewed individually or collectively give rise to a reasonable finding that defendant acted maliciously or in intentional disregard of plaintiffs' rights. On the contrary, as discussed,

17

plaintiffs offered *no* evidence that defendant's problems with bed bugs are any better or worse than other large hotels, nor that its prevention, inspection, and remediation efforts fall below any accepted industry standard, which almost certainly would have required expert testimony as discussed already. Absent such proof, defendant's practice of not mentioning the word "bed bug" and adopting a code name is also understandable.[17]

In the end, the *most* plaintiffs' evidence arguably shows, and certainly the *most* a reasonable jury could find, is that defendant was negligent in inspecting *their* room for bed bugs before and during their stay. Perhaps, if plaintiffs had evidence that they had actually complained to hotel staff of bed bug bites *during* their stay, and defendant did nothing to investigate that concern -- chalking it up to mosquitos or bugs in the water -- then that might give rise to a finding of reckless disregard, though it would still likely fall short of the intentional disregard standard under § 895.043. Plaintiffs, however, waited until checkout to complain about bites at all, and of bed bugs only after returning home, at which point defendant inspected the room and found evidence of bed bugs. That is *not* evidence of malice or intentional disregard of plaintiffs' rights.

Plaintiffs also point to *Mathias v. Accor Economy Lodging, Inc*., 347 F.3d 672 (7th Cir. 2003), as support of their claim for punitive damages. However, *Mathias* involved evidence of such widespread reports of bed bugs, that the hotel manager recommended "to her superior in the company that the motel be closed while every room was sprayed, but this was refused." *Id.* at 674. Moreover, the court found that following this refusal,

> The infestation continued and began to reach farcical

---

[17] Whether the risks of bed bugs is so great in the hotel industry as a whole to require warnings to consumers is even farther outside the scope of plaintiff's evidence here.

proportions, as when a guest, after complaining of having been bitten repeatedly by insects while asleep in his room in the hotel, was moved to another room only to discover insects there; and within 18 minutes of being moved to a third room he discovered insects in that room as well and had to be moved still again. (Odd that at that point he didn't flee the motel.) By July, the motel's management was acknowledging to EcoLab that there was a "major problem with bed bugs" and that all that was being done about it was "chasing them from room to room." Desk clerks were instructed to call the "bedbugs" "ticks," apparently on the theory that customers would be less alarmed, though in fact ticks are more dangerous than bedbugs because they spread Lyme Disease and Rocky Mountain Spotted Fever. Rooms that the motel had placed on "Do not rent, bugs in room" status nevertheless were rented.

*Id.* at 674-75. Worst still, the plaintiffs' in that case "were given Room 504, even though the motel had classified the room as 'DO NOT RENT UNTIL TREATED,' and it had not been treated." *Id.* at 675.

In contrast, the undisputed facts here demonstrate the Mt. Olympus has undertaken extensive efforts to address bed bugs, which is a problem for any commercial property with large amounts of traffic by the general public, particularly hotels, had no ongoing, widespread infestation issues, and lacked *actual* knowledge of the presence of bed bugs in plaintiffs' room during their stay. While defendant may have been negligent in inspecting the room for bed bugs, plaintiffs' evidence falls far short of showing maliciousness or an intentional disregard of their rights. Accordingly, the court will grant partial summary judgment to defendant on plaintiffs' claim for punitive damages.

ORDER

IT IS ORDERED that:

1)  Plaintiffs Fernando Diaz, Claudia Macias and Alani Diaz's motion to file a second amended complaint (dkt. #29) is DENIED.

2)  Defendant Mt. Olympus Resorts, LLC's motion for summary judgment (dkt. #30) is GRANTED IN PART AND DENIED IN PART.

Entered this 10th day of July, 2019.

BY THE COURT:


/s/

_____
WILLIAM M. CONLEY
District Judge